IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) ) | |
| Plaintiff, | ) ) | Criminal No.: 21-cr-128 (RC) |
| vs. | ) ) ) | |
| MICHAEL POPE, | ) ) | |
| Defendant. | ) | |

## SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL POPE'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29

Defendant Michael Pope, by and through the undersigned court-appointed counsel, hereby respectfully files this Supplemental Memorandum In Support of his Motion for Judgement of Acquittal Under Fed.R.Crim.Pro. 29 on Count One charging obstruction of a law enforcement officer in a civil disorder under 18 U.S.C. § 231(a)(3), and on Count Two charging obstruction of an official proceeding under under 18 U.S.C. § 1512(c)(2), at the U.S. Capitol on January 6, 2021. This memorandum of law responds to the Court's request at the end of trial for additional briefing on the controlling law applicable to its decision after the fractured appellate opinions in the larger January 6th litigation, and more generally, demonstrates that the evidence that came in a trial was insufficient as a matter of law to sustain a conviction for these two felony counts.

Michael Pope references admitted trial exhibits in support of this motion, and hereby incorporates his prior arguments and pleadings on these counts in this case.

## **INTRODUCTION**

*"The means employed must be proportionate to the extent of the mischief."* -- Alexander Hamilton. *The Federalist Papers : No. 28.*

Controlling D.C. Circuit precedent leaves key legal questions wide open for this Court to draw the line against the Government's over-reaching interpretations and disproportionate applications of the felony statutes at 18 U.S.C. §§ 1512(c)(2) and 231(a)(3) in Michael Pope's particular case. Unlike the strong evidence against plenty of January 6th defendants whose cases have been adjudicated already, Michael Pope showed no specific intent of the kind required by either statute, he did not do the kinds of acts proscribed by those statutes, and he did not act "corruptly" in protesting on the fringes of the Congressional proceeding of January 6, 2021.

In the heat of the Government's rhetoric at trial, Michael Pope was a "leader" of the mob who "came a long way to be part of the Capitol siege," and once there, engaged in "fighting" with officers and "pushing" his way into the U.S. Capitol. This Rule 29 motion is only possible because those characterizations proved baseless or highly exaggerated at best. The evidence actually admitted at trial showed no fighting and no pushing by Michael Pope, and never once did he express any intent to lay siege to Congress to interrupt or block its vote count proceeding. Michael Pope's trial took less than two full days not only because he admitted to every reasonable factual assertion by the Government under the sun, but also because the Government lacked for documentary evidence and witnesses who could remember

much about him.  Video showed that, amidst the mayhem of that day, he was a quiet, peaceful, and even friendly figure who missed the riot's main events.   His *own* misdeeds that day were lesser crimes of non-compliance with lawful authority.

The Government seeks to drive home its inapposite, most serious charges against Michael Pope by reference to the actions of others.  The Government has relentlessly sought to hang guilt-by-association on Michael Pope for his older brother William's door-jamming, door-knocking, and some more.  Upon close examination of the video and testimony, however, there is no basis for attributing William's deeds to Michael's agency or intent. The Government went especially over-the-top in trying to rope Michael Pope to the Proud Boys -- a passing subject of chat between the brothers.  More broadly, the Government attributes to Michael Pope responsibility for acts of vicious violence on officers and the threatened violence on legislators by rioters with whom he had no alleged contact at all, which indeed caused civil disorder that shut down the Electoral College vote certification proceeding for several hours.  However, the same logic the Government seeks to use against Michael Pope would brand everyone who was at the Capitol riot a felon and an insurrectionist – despite the misdemeanor-only charges with which the Government has appropriately handled a majority of January 6th defendants.[1]

---

[1] More than 1265 defendants have been arrested in the January 6th case, of whom 450 have been charged with assaulting, resisting, or impeding officers or employees, 125 with using a deadly or dangerous weapon or causing serious bodily injury to an officer, and approximately 330 with violating 18 U.S.C. § 1512(c)(2). Brief for the United States, p. 6, *Fischer v. United States*, Case No. 23-5572 (*petition for cert. granted* December 28, 2023), filed February 28, 2024.

Count Two, the 20-year maximum felony count of obstructing Congress under §1512(c)(2), should fail as a matter of law for a number of reasons, only two of which are foreclosed by current Circuit law subject to reversal this term by the Supreme Court.  There was a total lack of evidence of: (1) Michael Pope having a *specific intent* to obstruct, impede, interrupt and block from going forward Congress's electoral vote count proceeding, even granting that such was the outcome of the January 6th protest for several hours; and (2) Michael Pope acting "corruptly," such as using a felonious means or having a purpose to confer an unlawful benefit, as recognized by Circuit law.  The Rule of Lenity should apply to the analysis as to the "corruptly" elements because doubts as to the reach of the statutory language's scope should be strictly construed against the Government.  Furthermore, Michael Pope restates his positions for the record, though not supported by current Circuit law, that his actions did not fall within §1512(c)(2)'s *actus reus,* and that the electoral vote certification is not an "official proceeding" for purposes of §1512(c)(2).

Count One, the 5-year maximum felony count of obstructing law enforcement officers in a civil disorder, also fails as a matter of law for various reasons.  There was a total lack of evidence of: (1) Michael Pope having a specific intent to obstruct any of the law enforcement officers he encountered from doing their duties; and (2) Michael Pope committing acts with offensive use of physical force directed at an officer or officers, or arguably, the incitement of such conduct.  The Government has not proven one discrete, identifiable act fulfilling all elements of the offense under the plain language of the statute, versus a legally-unsupported "course of conduct"

theory.  Taking the events that day one-by-one, as they happened on that singular day, the insufficiency of the prosecution's evidence becomes clear.

Therefore, the Court should enter a judgment of acquittal as a matter of law on those counts of the Second Superseding Indictment.

## FACTS

### A. Pre-January 6th Communications and Plans

After the November 2020 Presidential Election, Michael Pope decided to travel from his home in Idaho to Washington, D.C. for the purpose of protesting there on January 6, 2021 over suspected election fraud in the 2020 Presidential Election. (Gov. Ex. 608 at 1.) That is, Michael Pope suspected at the time that the U.S. system of government and the democratic election process were being undermined by fraud. (*Id.*)

Michael and his brother William Pope decided to accompany each other in D.C. They exchanged Facebook messages discussing travel and camping logistics, what to pack, other groups expected to be in the nation's capital on January 6th, and the legality of bringing certain items with them – with multiple messages evincing Michael Pope's concern to abide by the law.  (Tr. 1/17/2024, at 154-158; Tr. 1/18/2024, at 209-213, 222-224.) Michael Pope's Facebook messages contained multiple references to the possibility of encountering potentially violent and assaultive Antifa activists or other "bad actors" in Washington, D.C. (Tr. 1/18/2024, at 206-208.) Prior to January 6th, the Trump Administration had characterized Antifa activists as a violent threat to conservative protestors. (ECF No. 204 Request for Judicial Notice.) There had been skirmishes in Washington, D.C. between

Trump supporters and Antifa just the previous November and December 2020. (Tr. 1/17/2024, 75-76.)

Before leaving home, Michael Pope concluded that it is "probably smart to just think defensively and stay out of trouble." (Tr. 1/18/2024, at 223.)  As to the various items of gear, that is where the Government's story ends. With the exception of flagpoles, there was no evidence that later on January 6th either Michael or William Pope possessed the items they had mentioned as their plans had constantly evolved in their pre-January 6th messages. (Tr. 1/18/2024, at 206, 208-209, 224.)

There is no evidence that, pre-January 6th, Michael Pope specifically discussed going to the U.S. Capitol on that day,[2] or that he ever discussed blocking the electoral vote certification proceeding. (Tr. 1/18/2024, at 214.) Further, there is no evidence that Michael Pope was a Proud Boy or Oath Keeper, nor that he wanted to participate as such, nor that he had a history of committing political violence or takeovers of legislatures. (Id.)

## B. Michael Pope's January 6th Attendance at the White House Rally

Michael Pope did fly as planned into Washington, DC from Idaho, and attended the January 6, 2021 rally called by President Trump. (Tr. 1/18/2024, at 63-64; Gov. Ex. 608 at 1.) He attended the rally at and around the White House Ellipse

---

[2] The Government's opening statement stated that "[t]he defendant came a long way to be a part of the Capitol siege." (Tr. 1/17/2024, at 9.)

from morning until mid-day and then marched in a crowd along with his brother William and tens of thousands of others towards the U.S. Capitol. (Id. at 1-2.)

On the afternoon of January 6th, a joint session of the United States Congress convened at the U.S. Capitol, for the purpose of tabulating and certifying the vote count of the Electoral College of the 2020 Presidential Election. (Id. at 2.) In the anticipated proceeding, elected congressional representatives would be contesting the 2020 presidential election results or the election count of electoral votes from eight states, resulting in hours of debate over these legislators' objections (Tr. 1/17/2024, at 73.) Michael Pope generally knew at the time that Vice President Michael Pence was at the U.S. Capitol to preside over the vote count and certification proceedings.[3] (Gov. Ex. 608 at 2.) However, apart from the possibility he heard his brother William say something about VP Pence while streaming a long speech on his phone during the march, there was no further evidence as to when, how, or in what context Michael Pope had this consciousness.

As the proceedings continued, a large crowd gathered outside the U.S. Capitol. (*Id.*)

## C. Bike Rack Barrier

---

[3] Michael Pope admitted knowledge of VP Pence's location at the Capitol as part of his pre-trial misdemeanor guilty plea, though the Government had little evidence of it. Some district judges have ruled this is a requirement of proof for unlawful presence in a restricted area in violation of Title 18, United States Code, Section 1752(a).  The only other evidence of this was the video where he looked over after his brother called out his name, mentioning elsewhere in a long soliloquy that VP Pence was down at the Capitol.  (Tr. 1/17/2024 at 143-144; Gov. Ex. 103.)

Michael Pope arrived at the U.S. Capitol on January 6th before 2 pm, where barriers, including bike racks, were around the exterior of the U.S. Capitol building to prevent unauthorized persons such as Michael Pope from entering the building, while at some locations barriers were removed. (*Id.;* Tr. 1/17/2024, at 28-29.)

An officer from the U.S. Capitol Police, Pernell Clark, stood in front of one of the bike racks as Michael Pope and other protestors approached. Previous to trial, Officer Clark could not recall for investigators his interactions with Michael Pope, but at trial he narrated from amateur video how Michael Pope pulled down the bike rack in front of him, along with others. (Tr. 1/17/2024, at 102, 107-109, 110; Gov. Ex. 114A at 01:27.)  Officer Clark pulled the bike rack back up, and as he did so Michael Pope's foot went in motion in the same direction towards the bike rack going back up. (Gov. Ex. 114A.) Having not recalled previous to trial the actions of the person identified as Michael Pope, Officer Clark interpreted the video of this foot motion on direct examination as "not helpful" and an "attempted kick" at the bike rack. (Tr. 1/17/2024 at 101,109.)

Officer Clark narrated that while Michael Pope was still behind one of the bike racks, prior to Michael stepping over the bike rack and walking towards the Capitol Building, people were already streaming in past the bike racks and were making their way to the building. (Tr. 1/17/2024, at 110; Def. Ex. 1 at 0:18:25-0:20:0.)  While Michael Pope was still behind the pulled-down bike rack, the officer turned around and went back toward the Capitol Building turning his attention away from the bike rack and away from Michael Pope. (Tr. 1/17/2024, at 110.) It

was only then that Michael Pope stepped over the barrier which, as Officer Clark agreed, was at that moment a "lost cause."[4] (Tr. 1/17/2024, at 110; Def. Ex. 1 at 0:18:51-0:20:79.)

During their brief encounter, Michael Pope did not push or shove Officer Clark.[5] (Tr. 1/17/2024, at 107.) For reasons that he did not detail, Officer Clark agreed with the prosecutor's leading question that "all the video" that he saw showed the actions of Michael Pope "and other rioters" impeded, obstructed, and interfered with his ability to execute his duties on that day. (Tr. 1/17/2024, at 106.) Officer Clark did not testify recalling any particular way in which Michael Pope acted towards him.

### D. Post-Bike Rack, Pre-Entry Into the Capitol

Following the bike rack incident, Michael Pope is on video waving his flag around in the air briefly in front of one of the several groupings of protestors streaming together around the Capitol, and making what appears to be gesture pointing forward with a hand. (1/17/2024 at 104-150, Gov. Ex. 120 at 1:40.) There was no testimony or video evidence that Michael Pope was himself responsible for the protestors behind him having eluded the system of barriers. There were no scenes of violence and destruction at this point within Michael Pope's view.

---

[4] After admitting these facts on cross-examination, Officer Clark then quickly volunteered that he did "stick around the barrier for a little" because he was trying to keep people from intruding, before going to the Capitol. (Tr. 1/17/2024, at 110-111.)  His "sticking-around" was, at a minimum, not evident from video of the moment in which the two men part company. (Def. Ex. 1 at 0:15:72-0:20:79.)
[5] In its opening statement, the Government promised that "the court will see video of the defendant fighting officers for control of the barricades." (Tr. 1/17/2024 at 10.)

Next, in an approximately 20-minute span (which eluded the FBI's otherwise meticulous tracking of Michael Pope into and around the Capitol Building), Michael Pope spent time outside of the Capitol building near the Senate Carriage Door – at two moments providing water to a police officer and fist-bumping one of them, thus displaying considerable goodwill towards the Capitol Police. (Def. Ex. 4 generally, and at 5:47 and 15:33; Tr. 1/17/2024, at 167, 170, 171.) This long passage also showed that Michael Pope and his brother were not "joined at the hip" on the Capitol grounds. (Tr. 1/17/2024, at 171.)

### E. Carriage Door Entrance

After the span of approximately twenty minutes wandering around outside -- far away from crowds of rioters clashing with police -- at approximately 2:18:08 p.m., Michael Pope entered the Capitol through the Carriage Doors. (Gov. Ex. 608 at 3.) This was after the certification proceedings had gotten underway and were not yet completed. (Gov. Ex. 608 at 3.) Michael Pope entered knowing that his presence was not authorized. (Gov. Ex. 608 at 3.)

U.S. Capitol Police Captain Sean Patton was there trying to get demonstrators out of the building so that he could secure these doors which Michael Pope used to enter. (Tr. 1/17/2024, at 35-36, 39.) He agreed that in June 2022, when he was interviewed by the case agent, he could not recall anything more about the person identified as Michael Pope during the Senate Carriage Door incident than what he could perceive from the video. (Tr. 1/17/2024, at 63-64, 81-83.) By the time

of this trial, Captain Patton had already testified in several other cases, reviewing video with agents and prosecutors, and offering explanations of what he saw on video but did not necessarily remember himself. (Tr. 1/17/2024 at 61-62.)

Captain Patton was telling the crowd trying to enter the Capitol that they could not come into the building. (Tr. 1/17/2024, at 39.) Michael Pope followed his brother and walked into the Capitol. (Gov. Ex. 100 at 1:08).  There was no testimony or other evidence that Michael Pope pushed his way into the Capitol through the doors or had any physical contact with the officers there.[6] Captain Patton described motioning with his hand to William Pope not to come in. (Tr. 1/17/2024 at 41.) There was no testimony about this command that was specific to Michael Pope.

 After entering the building, Michael Pope stood in a cubby area. Captain Patton expressed an opinion that Government Ex. 112, which is amateur video that has sound, is a better depiction of this scene than other videos because one could hear the chaos that is going on in the building.  (Tr. 1/17/2024, at 47.)  On this video, one could not observe his commanding voice directed at Michael Pope.

Soon after entering, William Pope nearby stuck a flagpole inside of the door hinge, preventing the door from being closed as individuals were trying to enter the building. (Tr. 1/17/2024, at 43-44.)  Captain Patton was not sure if the flagpole insertion by William Pope was intentional. (Tr. 1/17/2024 at 64-65.)

---

[6] The Government's opening statement claimed that Michael Pope pushed past police officers trying to block his entrance to the building. (Tr. 1/17/2024, at 10.)

Captain Patton observed at trial that there is a 90-degree angle between the wall on the right and the door hinge and another indentation due to the marble wall. (Tr. 1/17/2024, at 69-72.) Here, the vertical on the right side of the door is seen from afar, before William Pope had the pole inside the door-hinge:



(Screen grab of Gov. Ex. 101 at 00:04.)

The following close-up shows the 90-degree angle and then the depth (as deep as the right side of a square floor tile) from that angle back to the door-hinge:



(Screen grab of zoom-in on detail in Gov. Ex. 101 at 0:05.)

William Pope's body and flag were partially blocking the view of what was happening during the insertion of the flagpole, if viewed from the wall to the right of the hand sanitizer stand (from the picture's perspective), where Michael Pope stood. (Tr. 1/17/2024, at 72-73.) The following shot indicates this blocked view from off-camera to the right of William Pope and his flagpole jammed in the door:



(Screen grab of Gov. Ex. 101 at 00:05.)

There was, in general, no evidence that Michael Pope registered during those brief moments what his brother was doing with the jammed-open door, let alone that he assisted his brother's action.

Captain Patton opined that Michael Pope and William Pope were security threats. (Tr. 1/17/2024, at 48.) He also applied this characterization to *every* individual that entered the building without a security check -- they *all* were considered a threat by Captain Patton. (Tr. 1/17/2024, at 63.)  As a supervisor, Captain Patton understood that officers can make inaccurate judgments about protester's motives as hostile when they were not hostile or were even helpful. (Tr. 1/17/2024, at 65.)

In the process of trying to clear the Capitol of protestors, Captain Patton determined that because of the dynamic of the crowd, it was easier to have individuals inside the building and secure the door rather than forcibly getting individuals out. (Tr. 1/17/2024, at 44.) Michael Pope then remained in the Capitol once the doors were closed and went into the building, entering into a Senate elevator. (Tr. 1/17/2024, at 44, 80.)

## F. Elevator

Captain Patton explained that after ordering the doors shut with protestors inside the building, he soon found and removed several individuals from the elevator down the hall from the Senate Carriage Door after first trying to get them

to leave with verbal commands. (Tr. 1/17/2024, at 80; Gov. Ex. 102.) It became clear that Captain Patton was testifying based on what he saw in the video after he erroneously over-stated the length of time of the elevator incident by several times. (Tr. 1/17/2024 at 46, 49, 60-61, 80.)

Undisputedly, of course, Michael Pope was one of those several individuals removed from inside the elevator. There was no video with a view of what happened inside the elevator, and no testimony about what specifically was said then back and forth between protestors inside the elevator and police. After several seconds, police removed Michael Pope. The Court asked Captain Patton how *much* force was necessary to get the individuals out of the elevator, to which he replied rather non-responsively that they had to "put [their] hands on the individual . . . individuals. They wouldn't come out freely," and that one of the officers grabbed Michael's backpack strap to pull him out of the elevator. (Tr. 1/17/2024, at 80.)

After taking him out of the elevator, police physically directed Michael Pope at this point to go further into the Capitol, with which direction he complied.[7] (Gov. Ex. 102, at 1:50; Tr. 1/17/2024, at 136.) There was no evidence that Michael Pope's presence in the elevator had any connection in his mind or in the minds of those

---

[7] The Government's opening statement put a gloss of aggressiveness on Michael Pope's movement further into the Capitol at direction of police upon being brought out of the elevator, saying that "at approximately 2:19 p.m. the defendant resisted the orders of Capitol Police to leave the elevator….and the defendant **penetrated** further into the building." (Tr. 1/17/2024, at 11) (emphasis added.)

officers (who indeed sent him deeper into the building) with the electoral vote count proceeding, let alone with blocking it.

The Government concluded Captain Patton's testimony by eliciting the same formulaic and conclusory opinion on the ultimate issue as with Officer Clark, "after reviewing all of the video," that Michael Pope impeded and obstructed him and other officers from doing their duty. (Tr. 1/17/2024 at 59, 106.) Captain Patton did not testify recalling any particular way in which Michael Pope acted towards him.

### G. Senate Hallway

Moments later, thus having gone further into the Capitol building at police direction, Michael Pope had another interaction with a police officer, Special Agent Tucker Kleitsch, at the entrance to a hallway.[8] SA Kleitsch had been attempting to push "a lot of trespassers" out of the building. (Tr. 1/17/2024, at 115-116.) Before the encounter with Michael Pope, SA Kleitsch had just cleared a stairwell down that hallway which went to the second floor, and he was blocking the door with his body so that nobody could get past. (Tr. 1/17/2024, at 118.)

At that time, SA Kleitsch interpreted Michael Pope's actions to mean that Michael Pope was trying to get through to the stairwell, which is why SA Kleitsch was blocking with his body. (Tr. 1/17/2024, at 118.) Michael Pope got close to SA Kleitsch and touched his body with a leg at one point. (Tr. 1/17/2024, at 118, 120.)

---

[8] Once again over-promising what the evidence would show, the Government in its opening statement described Michael Pope "resist[ing] Officer Tucker Kleitsch's attempts to clear the area and imped[ing] Officer Kleitsch's attempt to do his job." (Tr. 1/17/2024, at 11.)

There was no testimony from SA Kleitsch or other evidence to distinguish Michael Pope's momentary touching of the officer from mere incidental contact in a loud and chaotic interior space, crowded with trespassing protestors.  SA Kleitsch did not recall anything Michael Pope said to him indicating that reaching the stairwell was an objective, or that Michael Pope even knew the stairwell was there.

Video of their encounter showed that a split second before being pushed out of the hallway's entrance towards the camera by SA Kleitsch, Michael Pope was looking away from SA Kleitsch and the hallway. (Gov. Ex. 115 at 1:54.) He was not facing the hallway. This video's angle on SA Kleitsch and Michael Pope is otherwise interrupted several times by individuals passing in front of the camera:



(Screen grab of Gov. Ex. 115 at 1:56.)

Before Michael Pope left the area, someone among the protestors around Michael Pope said something to him that "wasn't nice," but SA Kleitsch didn't

"remember what they said exactly," and couldn't specifically recall that it was Michael who said anything. (Tr. 1/17/2024, at 120, 125.)

The Government elicited circular testimony from SA Kleitsch that, because Michael Pope had to be removed from the hallway, he obstructed and impeded SA Kleitsch from removing protestors. (Tr. 1/17/2024, at 118-121.)

After January 6th, Mr. Kleitsch did not make any report describing this incident with Michael Pope. (Tr. 1/17/2024, at 125-126.)

### H. Speaker Nancy Pelosi's Suite

At an even later point after police had directed him further into the Capitol, video shows Michael and his brother walking into the hallway where Speaker Nancy Pelosi's office was located. (Tr. 1/17/2024, at 53-54; Gov. Ex. 110, 117.) There was no evidence that Michael Pope saw the posted sign over the Speaker's Suite identifying that space, or that he otherwise had known he was going there.

In this hallway, William, and not Michael, uses his flagpole to poke a door. (Tr. 1/17/2024, at 53-54; Gov. Ex. 110.) There was no evidence establishing that Michael Pope observed his brother poking the door, or encouraged this act.

After William does this, they decide not to go further into the hallway and turn back around. (Tr. 1/17/2024, at 53; Gov. Ex. 110.) This full video was less than a minute. (Gov. Ex. 110.).

## I. Finale

In the rest of Michael Pope's unauthorized wanderings around the Capitol, he did not enter the House or Senate Chambers, nor did he even have Capitol floor plan maps to show him where he was going. (Tr. 1/18/2024 at 215.) There was, in short, no evidence of Michael Pope having any planned objectives or destinations within the Capitol.

During the entirety of the events shown at trial, Michael Pope did not use his flagpole in any aggressive or violent way. (Tr. 1/18/2024 at 214.) There was no evidence of his communications with anyone, including William Pope, about any desire of his to interfere with the electoral count proceeding. There was no evidence of Michael Pope using violent or abusive language during his trespass.

Approximately 20 minutes after entering without authorization, at about 2:37:56 p.m., Michael Pope exited the Capitol. (Gov. Ex. 608 at 3.)  There was no evidence that Michael Pope was expelled from the Capitol Building by officers overcoming any desire of his to remain and stage an occupation of the place.

The next day, on January 7th, 2024, Michael Pope exchanged messages with a relative where he disclaimed reports of it being Antifa who breached the Capitol. (Tr. 1/17/2024 at 152.) Retrospectively analyzing the events, Michael Pope agreed that Antifa was likely among the crowd but that "it felt more like the people decided that fraudulent elections equate to a lack of representation and took back their

capitol in the 21st centuries equivalent to the boston tea party." (Tr. 1/17/2024 at 152, Gov. Ex. 200F.)

The Government did not present any messages or other evidence in which Michael Pope described his *own* particular actions at the U.S. Capitol. Nor did the Government present any evidence to contradict Michael Pope's after-the-fact account of his brief trespass stating that he had <u>not</u> come across significant scenes of violence. There was no evidence that the full violence and enormity of that day, amounting to civil disorder, was clear to him as he passed through the Capitol.

Michael Pope was arrested in Idaho and was cooperative with the arresting state officer. (Tr. 1/18/2024 at 217.) Michael Pope later acknowledged the error and criminality of his actions on January 6th, ultimately leading to his partial pleas of guilty before trial -- which he entered without any benefits or assurances from the Government. (Gov. Ex. 603). He admitted many of the facts alleged by the Government, whether easy to prove or not, as the undisputable truth.

In sum, the evidence showed a person of principle and public-minded beliefs making once-in-a-lifetime mistakes -- unauthorized trespassing and demonstrating -- at an unprecedented event in the nation's history.

## ARGUMENT

The Federal Rules of Criminal Procedure provide that:

> After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.

Fed.R.Crim.Pro. 29(a).

Construing the evidence in a light most favorable to the Government, Michael Pope must be acquitted as a matter of law of his felony counts because no rational trier of fact could find the evidence was sufficient to meet all the elements of the felony offenses in this case beyond a reasonable doubt.[9] *See United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001) (citations omitted).

## I. EVIDENCE FOR COUNT TWO, OBSTRUCTING AN OFFICIAL PROCEEDING UNDER SECTION 1512(a)(2), WAS INSUFFICENT AS A MATTER OF LAW

### A. The Government Did Not Prove Michael Pope Had the Specific Intent To Obstruct the Electoral Vote Count and Certification Proceeding

The Government would like the Court to conclude that, because Michael Pope participated in a historic disturbance which, in fact, resulted in the temporary interruption of Congress's electoral vote count, that such was his specific intent as required as an element of a violation under §1512(c)(2).  This is not so.

---

[9] Of course, as the finder of fact in the bench trial, this Court would then have to go on and assess the evidence not under the "light most favorable to the Government" standard of Rule 29, but by construing the evidence *to the extent it sees fit* in line with Michael Pope's defense. This brief will focus on the complete failures of proof beyond a reasonable doubt that should lead to granting Rule 29 judgment.

As this Court has previously held in a January 6th case, § 1512(c)(2) is a  specific intent statute that requires that a defendant, *acting with consciousness of wrongdoing and intent to obstruct*, attempts to or does undermine or interfere with an official proceeding. *United States v. McHugh*, 583 F. Supp. 3d 1, 21 (D.D.C. 2022). In order to be convicted of obstruction under § 1512(c)(2), a defendant must have been "aware that what he does is precisely that which the statute forbids," and been intending to do so. *See id.* As part of establishing this specific intent, the Government must prove a nexus such that the charged conduct must have the natural and probable effect of interfering with the official proceeding *and* the accused must have known that his actions were likely to affect the particular proceeding. *See id.* at *20 (citing United States v. Aguilar*, 515 U.S. 593, 602, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995)).

It is worth noting here, especially because of the Court's close attention to the state of Circuit law on this statute, that the lead opinion by Judge Pan of the D.C. Circuit in that court's three-way-split decision now before the U.S. Supreme Court contained the following telling of the elements of a violation of §1512(c)(2):

> First are its actus rei verbs—the defendant must obstruct, influence, or impede. Second is the adverb otherwise, which qualifies the verbs by indicating some relationship between the covered obstruction and the acts prohibited by subsection (c)(1). Third is the direct object—the defendant must obstruct an official proceeding. Fourth is a *mens rea* requirement—in obstructing an official proceeding, the defendant must act corruptly.

*United States v. Fischer*, 64 F.4d 329, 364 (D.C. Cir. 2023), *cert. granted*, No. 23-5572, 2023 WL 8605748 (Dec. 13, 2023).  Judge Pan's quick summary contains little

indication of a specific intent element distinct from the element of acting "corruptly," perhaps because in that appeal, there was no dispute between the parties on appeal about whether the defendants there allegedly intended to grind the Congressional proceeding to a halt.  *See id.* at 332 (citing alleged statements that "[i]f Trump don't get in we better get to war"; "Take democratic [C]ongress to the gallows. ... *Can't vote if they can't breathe* ... lol"; and "I might need you to post my bail. ... It might get violent. ... They should storm the capital [sic] and drag all the democrates [sic] into the street and have a mob trial.") (emphasis added).

The Government in Michael Pope's case, however, has conceded that specific intent *is* a distinct element, as stated before trial in its proposed instructions on the elements:

> In order to find the defendant guilty of this offense, you must find that the government proved each of the following elements beyond a reasonable doubt: First, the defendant attempted to or did obstruct or impede an official proceeding. Second, *the defendant intended to obstruct or impede the official proceeding*. Third, the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding. Fourth, the defendant acted corruptly.

(ECF No. 171.2) (emphasis added).

Moreover, the Government in the *Fischer* case filed its answering merits brief in the U.S. Supreme Court the week before last arguing that proof of a defendant intentionally hindering a congressional proceeding is not enough to show that he did so corruptly. Brief for the United States at 44, *Fischer v. U.S.*, (No. 22-5572) (*petition for cert. granted* Dec. 13, 2023).  In that brief, the Government made clear

that the charge under §1512(c)(2) meant the defendants corruptly "sought to prevent Congress from counting the certified votes of the Electoral College in the joint session," by "stand[ing] in the way of, or persistently oppos[ing] the progress or course of proceedings," and having "the purpose of disrupting [the] joint session." (*Id.* at 16, 19, 20).

Finally, last week the D.C. Circuit upheld a conviction at trial under §1512(c)(2), noting without issue that the district court found, among other elements established, that the defendant "acted with the intent to obstruct or impede the election certification when he breached the Capitol building. " *United States v. Brock*, --- F.4th ----, 2024 WL 875795, at *2 (D.C. Cir. March 1, 2024).  This was treated separate from the element of "corruptly," as will be discussed below.

As the Government has at times expressly conceded in this case, under Section 1512(c)(2) its charges mean that Michael Pope intended to "stop" the electoral vote count. However, there is, based on the trial record, a complete void of direct or circumstantial evidence that Michael Pope intended to stop the electoral vote count and certification proceeding from transpiring as it should have by law, through debate and voting by federal legislators.  All the facts show is that he protested suspected election fraud while Congress convened for that proceeding and was considering claims of fraud. In Michael Pope's case, there was zero evidence of any intent to prevent and disrupt the election certification proceeding from going forward, or to make the legislators disperse and not conduct the proceeding according to Congress's rules.

Rather, in practice here, the Government seeks to rely only upon the collective *effect* of his and the other protestors' actions – using the power of hindsight, and a "drop of rain" metaphor about contributing even in a small way to the chaos.  The Government has nothing to show Michael Pope's awareness at that time that he would have that effect, as required for a conviction.  The prosecution did not show Michael Pope *knew* he was one of those drops of rain.

Not a word of Michael Pope's many pre-January 6th Facebook messages offered as evidence at trial concerned disrupting the vote count, capturing or chasing away legislators, or even going to the U.S. Capitol. All of the Government's reference to the brothers' discussion of "gear" turned out to be a red herring falsely suggesting insurrectionist intent, when the context for the discussion involved the possibility of violent Antifa counter-protestors – *not* Capitol police.  These eye-catching items they discussed made no appearance on January 6th with the exception of flagpoles.

The Government in closing argument suggested that Michael Pope's intent to obstruct Congress formed at former President Trump's rally. This was a remarkable leap in logic given how the evidence showed virtually none of Michael Pope's words and actions at that rally -- merely acknowledgement of his brother William calling his name on the march to the Capitol.  The Government's chilling theory risks criminalizing and making evidence of a felony one's mere presence at a political rally and march occurring prior to the disruption of an official proceeding.

As to his conduct at the Capitol, the Government points to nothing that differentiates and elevates Michael Pope's actions from trespassing/demonstrating without lawful authority to an intention specifically to stop the vote count proceeding. Common sense tells us that disobeying the signs of unlawful presence at a site cannot be tantamount to intending to disrupt and block any official proceeding at that site. This novel theory has no precedent, amidst all the many protests that occur at what could be considered official proceedings. In the hands of some unhinged future government, such a legal proposition in applying a felony obstruction statute could be a dire threat to democracy.

The trier of fact must also recall that, after his initial entry into the Capitol, as unauthorized and regrettable as it was, police made a decision to shut the Senate Carriage Door with Michael Pope and others inside. Police made a later decision to take Michael Pope out from the elevator and direct him down the hall further into the Capitol. Michael Pope's wanderings thereafter, while still part of his illegal entry, do not bespeak any specific intent to block the electoral vote count proceeding going on in the chambers of the House and Senate.

B. <u>The Government Did Not Prove Michael Pope Acted "Corruptly"</u>

The Government did not prove its case that Michael Pope was "corruptly" obstructing or attempting to obstruct Congress, a key element of this serious felony that is currently before the U.S. Supreme Court in *Fischer*.[10] Notwithstanding a

---

[10] This supplemental memorandum results in part for the Court's request for briefing over the sometimes confusing state of the law on this subject, pending the

fractured Court of Appeals decision in *Fischer* that this Court mentioned at the end of trial, it is clear that the legal argument remains open in the D.C. Circuit that the Government does not prove that Michael Pope satisfies the element of having acted "corruptly" merely by having committed misdemeanor offenses, *e.g.*, of trespassing and protesting at the Capitol without authorization.  Recent D.C. Circuit authority from other January 6th cases does not support taking misdemeanors, resulting from a peaceful effort to convince members of Congress to raise and cast votes in objection to the vote certification, and bootstrapping them into the serious felony offense under § 1512(c)(2).  This Court should reject the Government's efforts to prove Michael Pope acted "corruptly" in this manner.  Michael Pope committed no independent felony conduct, as argued in the last section of this argument as to the § 231(a)(3) charge, and he sought no improper benefit, thus he must be acquitted of the charge under § 1512(c)(2).

First of all, it is not *Fischer* in which the D.C. Circuit has spoken most authoritatively on the definition of the "corruptly" element, but rather the subsequent decision in *United States* v. *Robertson*, 86 F.4th 355 (D.C. Cir. 2023); s*ee also United States v. Brock*, --- F.4th ----, 2024 WL 875795 *6 (D.C. Cir. March 1, 2024) (following *Robertson* and upholding trial verdict for sufficiency of evidence of "corruptly" element under § 1512(c)(2)). As explained below, *Fischer* only indirectly involved the "corruptly" element, and primarily determined the constitutionality of

---

high court's decision. Michael Pope anticipates that the decision expected by June may clarify the definition of "corruptly" even if it rejects the claim before it that the statute should be struck down as constitutionally vague.  If convicted, Michael Pope would request time to file yet more supplemental briefing on that outcome.

the separate *actus reus* element. However, in *Robertson*, the majority of the D.C.

Circuit panel explained:

> We conclude that "corruptly" must be construed according to its plain meaning; that the "corruptly" element in § 1512(c)(2) delineates whether a defendant's conduct is culpable; and that there are a range of ways to prove a defendant's "corrupt" intent or action.

*Robertson*, 86 F.4th at 364 (emphasis added).  Past case law showed that "proof of

'corrupt' intent or action may vary depending on circumstances," including that "the

type of proceeding" matters. *Id.*  Judge Henderson filed a dissent, opining that a

defendant is liable only if he intends to procure an unlawful benefit. *Id.* at 396 (J.

Henderson, dissenting).

In matters before Congress, the majority wrote, case law recognized the peril

that an overbroad definition of "corruptly" could "criminalize some innocent

behavior," because it is "commonplace for people — such as lobbyists, protesters,

and constituents — to lawfully 'attempt, in innumerable ways, to obstruct or

impede congressional committees.'" *Id.* The majority refused to limit the definition

to that one possibility offered by the appellant based on precedents, namely, "an act

dishonestly done 'with a hope or expectation of either financial gain or other benefit

to oneself or a benefit to another person.'" *Id.* at 363-64.

Using this framework, the D.C. Circuit concluded as to the sufficiency of

evidence for defendant's culpability:

> We hold that the jury could have found, consistent with the district court's instructions, that Robertson acted "corruptly" based on evidence that he used

> **felonious** "unlawful means" to obstruct, impede, or influence the Electoral College vote certification.

*Id.* at 364. The appeals court later added: "Applying the 'corruptly' element of the statute in this case is 'rather simple' because Robertson took action to obstruct Congress by force." *Id.* at 370.

Thus, after providing a framework for determination of the "corruptly" element, *Robertson* emphasized as the basis for its affirmance the unquestionable sufficiency of felonious behavior to meeting the sufficiency test, and it expressly left open the particular issue of greatest concern in Michael Pope's case:

> Whether § 1512(c)(2) applies to defendants who obstruct Congress by means of only "minor advocacy, lobbying, and protest offenses," *Fischer*, 64 F.4th at 380 (Katsas, J., dissenting), or by "non-criminal tortious activity," Opening Br. 15, is beyond the scope of our "limited" review and should be decided in a case that requires resolution of that question.

*Id.* at 370-71.

In *Robertson*, the Court of Appeals also made clear that the three earlier *Fischer* opinions "did not resolve . . . : How to define and apply 'corruptly' within the meaning of the statute." *Id.* at 375. Although the judges in *Fischer* opined on how to best define "corruptly," there was no binding definition as the majority's ruling reversing the district court's erroneous interpretation of § 1512(a)(2) focused on the "otherwise obstructs" clause. *Id.* Going through the opinions one by one: "The lead opinion in *Fischer*" by Judge Pan "determined that the facts alleged in the indictments were sufficient to support any definition of 'corruptly,' but did not adopt a definition, *i.e.,* the opinion did not state what was necessary to prove corrupt

intent." *Id.*  In the concurring opinion, Judge Walker wrote separately to note that his agreement with the court of appeals' interpretation of § 1512(c)(2)'s *actus reus* was premised on a specific construction of the "corruptly" element—rejected by both of the other panel members—as requiring proof that the defendant acted "with an intent to procure an unlawful benefit either for himself or for some other person." *Fischer*, at 340. In dissenting, Judge Katsas saw no need to settle on the interpretation of corruptly rather he argued that the *mens rea* element did not meaningfully limit the scope of § 1512(c) and that we should acknowledge that Congress limited the *actus reus* to narrow the reach of the statute. *Fisher* at 341.

Applying the means by which a defendant may act "corruptly" by intentionally acting to obtain an unlawful benefit for himself or for someone else, in a case two months ago this Court found that the defendant "intended to confer upon Donald J. Trump the 'unlawful benefit' of remaining in office, despite Trump's having lost the election. *United States v. Zink,* 2024 WL 111772 Crim. No. 21-191 (JEB) (D.D.C. January 10, 2024).

Turning now to the facts of this case, the Court should find that none of the options available under Circuit law for proving the "corruptly" element apply to Michael Pope. First, the Government cannot show felonious behavior by Michael Pope with a nexus to the official proceeding.  For reasons briefed below, there was insufficient of evidence for a violation under 18 U.S.C. § 231(a)(3), the only other felony charged here.

Second, there is no evidence that Michael Pope sought an illegal benefit of any kind for himself, nor did his protesting mean that he wanted something illegal for Donald J. Trump.  To the contrary, Michael Pope suspected that Trump's campaign was itself the victim of illegal activity.  The Congressional proceeding was taking place to examine and resolve such suspicions, and there is no evidentiary basis to find beyond a reasonable doubt that Michael Pope wanted to resolve those suspicions any other way in Trump's favor, illegally.

Third, the Court should decline to look to the misdemeanors of which Michael Pope is guilty to find that he acted "corruptly."  The Court should heed the concerns of individual judges that this would over-reach and endanger First Amendment behavior. The sweep of conduct brought in by merely requiring "independently unlawful means" would include "large swaths of advocacy, lobbying, and protest." *See Fischer*, 64 F.4th at 380 (Katsas, J., dissenting). Judge Katsas warned:

> Consider a few more examples. A protestor who demonstrates outside a courthouse, hoping to affect jury deliberations, has influenced an official proceeding (or attempted to do so, which carries the same penalty). So has an EPA employee who convinces a member of Congress to change his vote on pending environmental legislation. And so has the peaceful protestor in the Senate gallery. Under an unlawful-means test, all three would violate section 1512(c)(2) because each of them broke the law while advocating, lobbying, or protesting. *See* 18 U.S.C. § 1507 (prohibiting picketing outside a courthouse with the intent to influence a judge, juror, or witness); *id.* § 1913 (prohibiting lobbying by agency employees); 40 U.S.C. § 5104(e)(2)(G) (prohibiting demonstrating inside the Capitol Building). And each would face up to 20 years' imprisonment—rather than maximum penalties of one year, a criminal fine, and six months, respectively. So while this approach would create an escape hatch for those who influence an official proceeding without committing any other crime, it also would supercharge a range of minor advocacy, lobbying, and protest offenses into 20-year felonies. That still gives section 1512(c)(2) an improbably broad reach, because it posits that the

Corporate Fraud Accountability Act extended the harsh penalties of
obstruction-of-justice law to new realms of advocacy, protest, and lobbying.

*Id.*

As a final point weighing against an expansive definition of "corruptly" to
include committing misdemeanors, Congress passed statutes that actually apply to
Congress at 40 U.S.C. § 5104. Any harm that might be addressed by an unfettered
expansion of § 1512(c)(2) is already covered by 40 U.S.C. § 5104. Indeed, the
passage of statutes that actually apply to the U.S. Capitol buildings and grounds,
explicitly, is a strong indication of Congressional intent that § 1512(c)(2) does not
apply to the scenarios before the Court.

The facts of Michael Pope's unlawful trespass and parading demonstrate the
disproportionality and unreasonableness of labelling him a felony obstructionist of
Congress. It does not make common sense to do so for his being where he was not
allowed, nor for pulling and hopping over a bike rack barrier, nor for waving a flag
in front of other protestors once past the barriers, nor for not coming out of an
elevator fast enough for the police seeking to clear it, nor for somehow "touching" an
officer in a chaotic space into which another police officer had just directed him.

C. The Rule of Lenity Applies to the "Corruptly" Element In This Case

Finally, even if § 1512(c)(2) has very expansive *potential* textual reach, the
Court should decline to go to the limits because of the Rule of Lenity. This
argument, too, is open under current Circuit law.

As discussed above, various judges of the Court of Appeals in *Fischer* and in
*Robertson* have disagreed with each other in their *dicta* about the definition of

"corruptly," or otherwise balked at deciding on a single definition.  Even the majority in *Robertson* was not confident enough of the full scope of the definition of "corruptly" to cite court cases deciding the question of whether misdemeanor conduct is sufficient proof.

Because the traditional tools of statutory construction leaves doubt about the meaning of "corruptly" obstructing, influencing, or impeding a proceeding before Congress, as the term is used in Section1512(c)(2), this Court could invoke the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates v. United States*, 574 U.S.  528, 547-48 (2015) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000), in turn *quoting Rewis v. United States*, 401 U.S. 808, 812 (1971)). As it was in *Yates*, "[t]hat interpretative principle is relevant here, where the Government urges a reading of [Section 1512(c)(2)] that exposes individuals to 20-year prison sentences" for obstructing any proceeding before Congress in any manner that it deems "corrupt." *Id.* (citing *Liparota v. United States*, 471 U.S. 419, 427 (1985)) ("Application of the rule of lenity ensures that criminal statutes will provide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability.").

In determining the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in Section 1512, as it was for the Court in interpreting Section 1519 in *Yates*, it would also be "appropriate, before

[choosing] the harsher alternative, to require that Congress should have spoken in language that is clear and definite." *Id.*

Because Congress failed to do so, and the Government has charged and tried Michael Pope such that it is not "clear and definite" that his conduct violates the "corruptly" element of Section 1512(c)(2), this Court should acquit him of Count Two of the Indictment against him.

This argument about applying the Rule of Lenity to corruptly is left open by Circuit law despite an apparently erroneous holding in a recent decision by another judge of this Court.  In this other January 6th case, the Court stated:

> As a last-ditch attempt, defendant invokes the principle of restraint and the rule of lenity to argue that Section 1512(c)(2) should not apply to the alleged conduct here. Def.'s Mot. at 5–6. [4.1]The principle of restraint and the rule of lenity, however, do not apply when a statute is unambiguous. See *Fischer*, 64 F.4th at 350. "[T]he language of § 1512(c)(2) is clear and unambiguous," and "[r]estraint and lenity therefore have no place in our analysis." Id. Accordingly, under current and binding D.C. Circuit caselaw, the use of "corruptly" is unambiguous and encompasses defendant's alleged conduct.

*United States v. Todd,* Slip Copy (2024), Crim. No. 22-166 (BAH) 2024 WL 307390, at *4 (D.D.C. January 27, 2024).  The clear error here is that *Fischer's* Rule of Lenity holding and finding of unambiguity was necessarily addressing the *actus reus* element of § 1512(c)(2) that the Court of Appeals was asked to decide – not the "corruptly" element that was discussed incidental to the decision, and that resulted in three very different approaches, including Judge Pan explicitly not choosing a definition.  This Court in *Todd* seems to have read too much into the broad statement of unambiguity it quoted from *Fischer's* lead opinion by Judge Pan.

D. <u>The Government Failed To Satisfy What Should Be Its Burden of Proof As to Other Elements, But Is Not Its Burden Under Current Circuit Law</u>

The Government failed to show at trial that Michael Pope obstructed or attempted to obstruct an "official proceeding," or that he committed some act that qualifies as conduct that "otherwise obstructs, influences, or impedes" an official proceeding within the scope of the statute.  These points have already been argued pre-trial in Michael Pope's Motion to Dismiss Count Two (ECF No. 174), which this Court denied in a Minute Order on January 11, 2024 as contrary to Circuit law. Michael Pope does not suggest now that these points are open currently under Circuit law, but rather awaits the Supreme Court decision in *Fischer* for potential reversal, and/or clarification of the law.

## II. EVIDENCE FOR COUNT ONE, OBSTRUCTING A LAW ENFORCEMENT OFFICER UNDER SECTION 231(a)(3), WAS INSUFFICENT AS A MATTER OF LAW

The sufficiency of the Government's evidence at trial for obstruction of an officer in a civil disorder under § 231(a)(3) fails as a matter of law for the elements of intent and *actus reus*. As to the former, a careful review of the evidence of each encounter Michael Pope had with law enforcement fails to show proof beyond reasonable doubt of his desire to hinder those officers. As to the latter, the Government should have had to prove his offensive use of physical force, or at least his encouragement thereof, directed towards an officer or officers, which it could not.  This Court must go down each incident one-by-one, in its moment of time, and determine whether in each such incident the proof satisfied all elements.

A. <u>Under Section 231, The Government Did Not Prove That Michael Pope Intended to Obstruct Law Enforcement Officers</u>

Michael Pope intended to protest at the Capitol, and he did not heed the signs of authority around him that it was not legal to be doing so on January 6, 2021. This does not, however, amount to intent to obstruct the law enforcement officers seeking to enforce the Capitol's boundaries.

The issue of intent required to violate § 231(a)(3) appears not to have been addressed by the District of Columbia Circuit Court of Appeals. Other circuits have squarely found that the offense requires a *specific* intent to interfere with or obstruct law enforcement. *See National Mobilization Committee to End War in Viet Nam v. Foran*, 411 F.2d 934, 938 (7th Cir. 1969); *U.S. v. Mechanic* 454 F.2d 849, 854 (8th Cir. 1971); *United States v. Casper*, 541 F.2d 1275, 1276 (8th Cir. 1976). Although "[i]t is true that Section 231(a)(3) does not specifically refer to intent," Congress will not be presumed to have omitted a scienter requirement "where, as here, the crime is grounded on the common law." *Nat'l Mobilization Committee*, 411 F.2d at 937. Courts in this district have reached the same conclusion about *mens rea* in multiple cases concerning the January 6, 2021 civil disorder. *See United States v. McHugh*, 538 F.Supp.3d 1, 25 (D. D.C. 2022); *United States v. Williams*, 2022 WL 2237301 (D. DC 2022); *United States v. Gossjankowski*, 2023 WL 130817 (D.D.C. 2023); *United States v. Bingert,* 605 F.Supp.3d 111, 128-129 (D. D.C. 2022); *United States v. Fischer*, 2022 WL 782413 (D. D.C. 2022).

Here, the proof of Michael Pope's alleged obstructionist intent against the officers falls far short of proof beyond a reasonable doubt.  As a threshold matter, it

is insufficient for each testifying officer to incant that they believed themselves obstructed, after watching all the video; Michael Pope must have been aware of that at the time.  Then, as to the first incident, Michael Pope did nothing specifically intended to mess with Officer Clark.  Indeed, even though mishandling the bike rack, Michael Pope hopped that barrier only after Officer Clark turned and went off towards the Capitol where protestors were already streaming by past the bike racks.  Next, Michael Pope's friendly pre-disposition towards officers showed itself in an episode the Government somehow forgot in its meticulous tracing of events – the fist-bump and the watering of the officers outside the Capitol near the Senate Carriage Doors.  Then, Michael Pope did nothing, let alone intentionally, in relation to the jamming of the door-hinge.  Then, there is no evidence what transpired inside the elevator for it to take him emerge being held by police.  Then, there was no competent evidence as to what led to Michael Pope touching SA Kleitsch, thus no sound basis to declare it intentional.

The Government's case, built from these underwhelming shards of chance encounters, does not rise to the level of intentional efforts against the officers.

B. <u>Michael Pope Did Not Commit or Encourage Acts Of Physical Force Against Officers</u>

The District of Columbia Circuit Court of Appeals has not addressed the issue of what constitutes an "act to obstruct, impede, or interfere" with law enforcement under this statute.  The Eighth Circuit noted the statute requires more than mere presence at a civil disorder and therefore applies only to a further act committed during the course of the event.  *Mechanic,* 454 F.2d at 853. And in

similar fashion to the courts that have ruled on the mens rea issue, the Eighth
Circuit was mindful of the constitutional issues that arise when an actus reus
requirement is interpreted too broadly. *Mechanic* held that Section 231(a)(3) does
not apply to speech, but only covers "violent physical acts." *Id.* at 852 Some district
courts have disagreed with the holding in *Mechanic*, including judges within this
district. *See McHugh,* 583 F.Supp.3d at 28-29; *Mostofsky,* 579 F.Supp.3d at 23-24;
*United States v. Nordean,* 579 F.Supp.3d 28, 58 (D. D.C. 2021); *United States v.
Phomma*, 561 F.Supp.3d 1059, 1068 (D. Oregon 2021); *United States v. Wood*, 2021
WL 3048448 (D. Delaware 2021). There are important reasons, however, that the
Court should agree with the Eighth Circuit in *Mechanic* and find that violent
conduct is necessary to violate Section 231(a)(3) in this case.

Although Section 231 uses the "same language to proscribe the same conduct
that is proscribed at common law [for riots']," the bar for a 213 charge is higher.
*United States v. Grider,* 617 F. Supp.3d 42, 51 (D.D.C. 2022). Section 231 bars,
under certain circumstances, obstruction during "civil disorders" which the statute
defines as "public disturbance[s] involving acts of violence by assemblages of three
or more persons, which cause [ ] an immediate danger of or results in damage or
injury to the property or person of another individual." *Id.,* at 50-51 citing 18 U.S.C.
§ 232(1). However, this section, does not criminalize merely participating in a civil
disorder, as that would "consume vast swaths of core First Amendment speech."
*Nordean,* 79 F.Supp.3d at 58. This section criminalizes an individual's participation
in a civil disorder when they also "obstruct, impede, or interfere with a law

enforcement officer while that officer is suppressing the civil disorder. *Id.,* at 61. The barrier for proof of such conduct is not low.

When Section 231(a)(3) has been charged in relation to January 6th defendants, the allegations are most typically for violent acts. For instance, in *Mostofsky,* the defendant filed a list of over 60 January 6th defendants who were charged with violations of Section 231(a)(3) and that all appear to involve violent conduct, which that court noted. 579 F.Supp.3d at 24 (referring to ECF no. 47-1). Finally, as Judge Jackson noted in *United States v. Williams*, "[t]here are standard jury instructions on obstructing officers that have long since been approved by the Court of Appeals." 2022 WL 2237301 fn. 3 (citing Instruction No. 6.101, Obstructing Justice, Criminal Jury Instructions for the District of Columbia (16th ed.)). Jury Instruction No. 6.101 describes multiple offenses related to the general theme of obstruction of justice and they all involve some variation of physical harm or threats of harm (violence, threatening letter or communication etc). See Instruction No. 6.101, Obstructing Justice, Criminal Jury Instructions for the District of Columbia (16th ed.). These factors imply that a defendant would have to have been engaged in some sort of violent contact with law enforcement to be convicted of this offense.

Even the Government in another January 6th case recognized that there are some appropriate limits to interpretation of Section 231(a)(3) to the U.S. Capitol case, against overbroad applications to defendants who "merely trespassed" and should be charged with lesser offenses:

> The Court suggested that if the defendants were found guilty here, all January 6 defendants would be guilty of civil disorder. Not so. Defendants who merely trespassed over the restricted perimeter or entered the Capitol did not necessarily obstruct, impede, or interfere with law enforcement, and have appropriately been charged with lesser offenses. To interpret the civil disorder statute more broadly could, in its extreme, raise constitutional concerns of vagueness, and as such, the government has not charged lesser defendants with this crime.

Government's Opposition to Rule 29 Motion in *United States v. Mlynarek*, Case No. 23-cr-00114-ACR, ECF No. 51 ("Mlynarek Gov. Opp. Br."), at 13.

Accordingly, as the Government itself summarized in the *Mlynarek* case, the majority of cases it collected applying this statute to January 6th conduct have involved physical force against officers or marked police equipment, *see e.g., United States v. Blair*, 1:21-CR-00186 (Cooper, J.) (defendant pushing a lacrosse stick against a police officer's chest); *United States v. Griswold*, 1:21-CR-00459 (Cooper, J.) (defendant pushing his way past police trying to guard the Rotunda Doors); *United States v. Robertson*, 1:21-CR-00034 (Cooper, J.) (defendant confronting members of the Metropolitan Police Department with a large wooden stick); *United States v. Presley*, 1:21-CR-257 (Moss, J.) (defendant pulling on one of the officers' riot shields); *United states v. Mostofsky*, 1:21-CR-00138 (Boasberg, J.) (defendant forcibly obstructing officers who were attempting to adjust barriers in the West Terrace).  Mlynarek Gov. Opp. Br., at 3 & n.1. Recently, the Court of Appeals in the 11th circuit held that an individual disabling a police car on an interstate ramp during a civil disorder sufficiently obstructed the law enforcement response in the ongoing riot. *United States v. Pugh*, 90 F.4th 1318, 1333 (11th Cir. 2024). The

defense is not in a position to characterize other January 6th cases that do not in the Government's own words convey violence or threat of violence to police officers.

Michael Pope did not commit the kinds of acts fairly encompassed by Section 231(a)(3), as his actions towards officers that day were peaceful and not intentionally physical towards them, nor inciting of physical force.  First, Michael Pope mishandled a bike rack, not Officer Clark.  Michael Pope did not "fight" Officer Clark and other officers at the bike rack, as the prosecution promised the evidence would show.  Second, Michael Pope did not "push" any officer while entering at the Senate Carriage Door, also as claimed by the prosecution.   Third, Michael Pope had no involvement with, or necessarily even awareness of, William Pope's flagpole inserted into the door-hinge just out of view from where he stood along the wall in a cubby behind his brother. Fourth, Michael Pope's encounter with police in the elevator is shrouded in silence as to what was said, and by poor visibility from the camera angle. There is no evidence of any discernible force he used in resistance. Fifth, after being directed towards SA Kleitsch's position, he came into a hectic scene and merely "touched" SA Kleitsch, who then speculated upon Michael Pope's motives and shoved away Michael Pope from behind.  There was insufficient evidence that even this touch was intentional versus accidental.

To take any one of these actions by Michael Pope and brand him as a felon -- rather than just as the criminal trespasser that he admits to being -- would be grossly disproportionate to the extent of the mischief, to paraphrase Alexander Hamilton.  Many other cases of obstruction of officers on January 6th have obvious

merit; in this particular one, the Government would not back off its initial overreaction to the events at the Senate Carriage Door and in the elevator.  Instead of accepting Michael Pope's misdemeanor pleas and moving on to real menaces to society, it piled on proof of more minor encounters by Michael Pope with officers as the basis for Section 231(a)(3)'s severe penalties, trying to push the boundaries of this law too far.

### C.  The Court Must Find All Elements of the Offense In One Actus Reus

The Government has amalgamated all the various acts that it alleges Michael Pope did to obstruct law enforcement officers into a single count. Furthermore, the Government may want to avoid proving the elements of the offense as to any one act, calling this a "course of conduct" offense. The Court should reject this theory and require that each alleged instance of obstructive conduct meet all the elements, especially those key ones discussed in the preceding section.

First, the Government's characterization of the *actus reus* for Section 231(a)(3) in Count One as a "course of conduct" (ECF No. 184, at 10) is contrary to the plain language of the statute, which prohibits "an act" against a specific officer or officers. *See* § 231(a)(3).  Undersigned counsel searched for, but could not find, any federal case law holding that obstruction under § 231(a)(3) could be analyzed as a "course of conduct," nor apparently could the Government.  Certainly, there is no authority for a case under § 231(a)(3) where the Government strings together different acts, no single one of which fulfills all the elements of the offense. Obstruction under § 231(a)(3) is not an offense consisting of a scheme or a

conspiracy, which by definition involve a series of acts with different means.  The offense under § 231(a)(3) is not even on par textually with obstruction of an official proceeding under 18 U.S.C. § 1512, which this Court has held is an offense that can be carried out by various means, seemingly spanning different places and times. *See United States v. Weeks*, 636 F.Supp.3d 117,122 (D.D.C., 2022)

The Government stretches to escape its responsibility for proving that any of the discrete acts it offers violated § 231(a)(3), and to re-frame the offense as a "course of conduct," that it has taken to describing the offense as "disorderly conduct" (ECF No. 184, at 10), which it is not. Disorderly Conduct is a different offense than § 231(a)(3) and is also charged here in this case under two statutes as misdemeanors: Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); and Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D).

This need to prove that each alleged instance of "**an act** to obstruct, impede, and interfere with **a law enforcement officer**" meets all the elements of an offense under § 231(a)(3) should be incorporated into the Verdict Form used by the Court.  Michael Pope has proposed one.  (ECF No. 201.)

## CONCLUSION

WHEREFORE, for the foregoing reasons, and the other arguments and files in the record, the Court should enter a judgment of acquittal as a matter of law under Rule 29 for Counts One and Two of the Second Superseding Indictment.

Alternatively, the Court as finder of fact should simply find defendant not guilty beyond a reasonable doubt of those same counts.

Dated this 8th day of March, 2024.

Respectfully submitted,

/s/ Bruce H. Searby

Bruce H. Searby, DC Bar No. 1012382
SEARBY PLLC
2000 P Street, NW, Suite 705
Washington, D.C. 20036
Tel: (202) 750-6106
Fax:  202-849-2122
bsearby@searby.law

COUNSEL FOR DEFENDANT
MICHAEL POPE

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of March, true and genuine copies of SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT MICHAEL POPE'S MOTION FOR JUDGMENT OF ACQUITTAL UNDER RULE 29 were served via electronic mail by this Court's CM/ECF system, which will serve a copy on all counsel of record.

Respectfully submitted,

/s/ Bruce H. Searby_____
Bruce H. Searby, DC Bar No. 1012382
SEARBY PLLC
2000 P Street, NW, Suite 705
Washington, D.C. 20036
Fax:  202-849-2122
bsearby@searby.law